UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

AMANDA SCHNEIKER,

       Plaintiff,

         v.

COMMUNICATIONS ENGINEERING
COMPANY,

       Defendant.

Case No. 2:22-CV-01400

**AMENDED COMPLAINT**

Plaintiff, Amanda Schneiker ("Schneiker"), by her attorneys, Reinhart Boerner Van Deuren s.c., as and for her Amended Complaint in this action against Defendant Communications Engineering Company ("CEC" or "Defendant"), seeks damages from CEC in the form of unpaid commissions (wages) and other obligations, in connection with CEC's interference with her contract with a third party and due to CEC's unjust enrichment as described below. Schneiker specifically alleges as follows.

**PARTIES AND RELATED ENTITIES**

1.      Schneiker is an adult resident of the State of Wisconsin, residing at 15405 Turnberry Drive, Brookfield, Wisconsin 53005.

2.      CEC is an Iowa corporation with its principal place of business at 405 Boyson Road, Hiawatha, Iowa 52233 and a Wisconsin agent for service of process at 8020 Excelsior Drive, Suite 200, Madison, Wisconsin 53717.

3.      Select Sound Service, Inc., ("Select Sound"), is a Wisconsin company that at relevant times performed business in Wisconsin selling healthcare communications devices and

50371805

services, including Rauland Borg Corporation ("Rauland") healthcare products like nurse call systems and related functions, to hospitals and other healthcare providers.

## JURISDICTION AND VENUE

4.      Jurisdiction over Defendant is proper according to 28 U.S.C. § 1332.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## BACKGROUND

6.      CEC sells and services communications equipment, including equipment for use in healthcare facilities in Iowa and in parts of Wisconsin including Milwaukee County, Wisconsin.

7.      CEC's offices in Wisconsin are located at 2902 Dairy Drive, Madison, Wisconsin, 53718; 3080 S. Calhoun Road, New Berlin, Wisconsin 53151; and 2200 American Blvd, De Pere, Wisconsin 54115.

8.      Prior to May 2019, Schneiker was employed as Vice President of Sales for Select Sound. In that capacity, she worked to further Select Sound's business in the sale of Rauland healthcare products and other healthcare and communications-related products to hospitals in Wisconsin.

9.      In or about 2018, Select Sound and CEC began engaging in discussions that eventually lead to a sale of assets to CEC by Select Sound in or about May 2019.

10.      On information and belief, CEC purchased Select Sound's assets so that Rauland would transition Select Sound's Rauland account and relationship away from Select Sound to CEC, a transition that was desired by and coordinated between Select Sound, CEC and Rauland.

11.      Schneiker assisted Select Sound and Rauland in coordinating the transition of the Rauland account and relationship from Select Sound to CEC.

2

12.     On information and belief, Select Sound's sale of its assets to CEC was conditioned upon agreements between Select Sound, CEC and Rauland, that Rauland would transfer Select Sound's Rauland account and relationship to CEC after the sale.

13.     CEC's payment to Select Sound for its assets and the transition of the Rauland account and relationship was divided between payments due to Select Sound at closing, which occurred in or around May 2019, and payments due to Select Sound in the years following the closing.

14.     At the end of each fiscal year following Select Sound's sale of its assets to CEC, around or after May or June of each year between 2020 and 2023, CEC was contractually required to pay Select Sound additional amounts if CEC achieved certain net sales and revenue targets for certain products and services that had been acquired by or transitioned to CEC from Select Sound in connection with its purchase of Select Sound's assets. Those products included Rauland healthcare, communications and educational products, products capable of being integrated into such Rauland products, and related services and agreements (herein referred to as "Qualifying Sales").

15.     CEC's agreement to purchase Select Sound's assets was also conditioned upon Schneiker's employment with Select Sound terminating at or around the time of the sale, and upon CEC then hiring Schneiker as a healthcare executive so that Schneiker could help CEC successfully transition Select Sound's revenue streams relating to the Qualifying Sales from Select Sound to CEC.

16.     In order to secure Schneiker's assistance in transitioning the Select Sound revenue streams relating to Qualifying Sales from Select Sound to CEC, Select Sound, Schneiker and Schneiker's husband entered into a Retention Agreement that was signed by all parties.

50371805

17.     On information and belief, CEC was aware of the Retention Agreement at the time that Schneiker and Select Sound entered into it, and CEC had communicated its desire to have Select Sound secure Schneiker's agreement thereto, so that Schneiker would be incentivized to help CEC achieve success in relation to making Qualifying Sales during Schneiker's employment with CEC.

18.     The Retention Agreement required Select Sound to pay Schneiker a retention bonus that consisted of two parts, which mirrored the payments due from CEC to Select Sound pursuant to the agreement between CEC and Select Sound. Select Sound was first required to pay Schneiker an initial bonus after the close of Select Sound's asset sale to CEC. Second, Select Sound was required to pay Schneiker $150,000.00 per year, or a portion thereof, based on the amounts that Select Sound was entitled to receive from CEC for that year based on CEC's Qualified Sales.[1]

19.     Schneiker performed all preconditions required to receive the Retention Bonus under the Retention Agreement, including by providing Select Sound with all requested transition assistance and consulting services during each year since signing the Retention Agreement.

20.     Select Sound did pay Schneiker the initial bonus under the Retention Agreement.

21.     However, CEC has caused Select Sound to not pay Schneiker any portion of the yearly $150,000.00 payment in any year thereafter by improperly and artificially suppressing the Qualifying Sales in order to prevent any earnout bonus being paid to Select Sound during each

---

[1] The proportion of the yearly retention bonus owed to Schneiker under the Retention Agreement mirrored the proportion of the earnout bonus that CEC owed to Select Sound for the same time period (e.g., if Select Sound was entitled to receive 50% of its earnout bonus for a given year from CEC, then Select Sound was required to pay Schneiker 50% of her potential retention bonus for that year).

50371805

year, which has interfered with Schneiker's right to receive her yearly bonus payments under the Retention Agreement.

22. CEC hired Schneiker as a Director of Healthcare Sales based out of CEC's Milwaukee office on or about May 16, 2019.

23. CEC was aware during Schneiker's employment with CEC that the Retention Agreement required her to provide transition assistance and consulting services to Select Sound, after the sale of Select Sound's assets to CEC and after becoming a CEC employee, with respect to each year when CEC was contractually required to pay Select Sound an earnout payment if CEC achieved the requisite revenue targets that year.

24. Between May 2019 and the present, CEC has intentionally and artificially suppressed Qualifying Sales during Schneiker's CEC employment by engaging in the following improper activities (among others known or to be discovered): (1) booking sales to Wisconsin-based hospitals or healthcare providers, which would be Qualifying Sales, as sales to hospitals or healthcare providers in Iowa, which resulted in those sales not being counted as Qualifying Sales; (2) not booking Qualifying Sales at all; and/or (3) by changing the coding for Qualifying Sales within CEC's system such that sales would not be counted as Qualifying Sales.

25. CEC's agents and management were aware during Schneiker's employment of the Retention Agreement and aware that the Retention Agreement required Select Sound to make yearly payments to Schneiker based on CEC's need to pay Select Sound under the terms of CEC's purchase of Select Sound's assets based on Qualifying Sales.

26. Nonetheless, in her position for CEC, Schneiker provided leadership that enabled CEC's Healthcare Sales Group to meet and exceed sales-related goals that were set by CEC management.

27.     During her employment with CEC, Schneiker was compensated with both salary and commissions. Her commissions plan was detailed by her yearly CEC Compensation Plan.

28.     Under her 2021 CEC Compensation Plan (the "Compensation Plan"), Schneiker was entitled to earn commissions for new business projects, on managed service contracts, on hold accounts and on Rauland Enterprise Opportunities.

29.     Under the Compensation Plan, Schneiker earned commissions before the end of her employment, which CEC failed and refused to pay Schneiker on the day such commissions were due, within 30 days of the end of Schneiker's employment, upon Schneiker's demand that they do so, or at any time since then. Specifically:

    a.   Schneiker earned at least $80,000.00 in commissions on new business and managed service contracts under the Compensation Plan before the end of her employment, based on invoices that were sent to customers before the end of Schneiker's employment, which CEC has nonetheless not compensated Schneiker for;

    b.   Schneiker earned around $60,000.00 in commissions on a "hold" account, which was offered to her by CEC's Vice President of Sales, Tyler Ebnet ("Ebnet"), in or around February 2021, which she accepted and which Ebnet approved with regard to a $1.2 Million project on which Schneiker was entitled to a 5% commission in the Compensation Plan;

    c.   Schneiker earned an additional $10,000.00 - $25,000.00 in "new business" related commissions, from which Ebnet wrongfully withheld his approval without basis prior to the end of Schneiker's employment, thus preventing CEC from invoicing customers for the orders off of which Schneiker had earned the commissions; and,

    d.   Schneiker earned an additional $40,000.00 in "new business" and "managed services" commissions, which were not invoiced prior to her termination by negligence or intentional delay by one or more agents of CEC.

30.     Because the Compensation Plan provided that "this plan is subject to change at any point by either parties" [sic], promises and other side agreements between CEC and Schneiker regarding payable commissions may be recovered pursuant to the Compensation Plan.

6

31.     Ebnet offered and agreed that Schneiker could place a hold pursuant to the Compensation Plan on the above-referenced $1.2 Million account because Schneiker had been the primary individual with sales-related responsibilities who had secured the account for CEC.

32.     Schneiker was terminated on October 4, 2021 by Ebnet after Schneiker resisted Ebnet's direction to lower the compensation CEC offered to a candidate for a sales position, which that candidate had already accepted and quit her former employment in reliance thereon to take.

33.     On information and belief, Ebnet and CEC's Chief Executive Officer or others in CEC's management, also intentionally terminated Schneiker's employment in order to avoid paying her the additional commissions on the projects that had not yet been invoiced, and the $60,000.00 commission on the $1.2 Million "hold" account, which Schneiker had consistently asked Ebnet when she would receive pursuant to the agreement.

34.     Since her termination on October 4, 2021, Schneiker has made multiple demands to CEC for her unpaid commissions but, to date, CEC has ignored and refused her requests for information about and payment of her unpaid commissions.

35.     Schneiker and/or her team achieved each of the preconditions in the Compensation Plan entitling her to the earned commissions payments in the amounts specified above.

36.     As of this filing, CEC has paid none of the unpaid commissions sought in this Amended Complaint, which total between $190,000.00 and $205,000.00.

37.     Since terminating Schneiker's employment on October 4, 2021, neither CEC, nor anyone on its behalf, has sent any notice to Schneiker regarding Schneiker's right to continue participating in CEC's group health plan pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA").

38.     On information and belief, CEC has also continued to intentionally suppress Qualifying Sales after Schneiker's CEC employment terminated, causing CEC to not pay out any earnout amount to Select Sound in either May or June of 2022 and 2023, which has interfered with Schneiker's right to receive a yearly bonus from Select Sound under the Retention Agreement for those years.

39.     Since Schneiker initially filed this litigation in November 2022, the parties have exchanged information and documents pertaining to CEC's revenue and sales that relate to commissions that Ms. Schneiker has alleged that CEC owes to her in relation to her employment.

40.     In the course of so doing, CEC provided Schneiker with information about sales, revenues and accounts connected to her CEC employment that allowed Schneiker to discover that CEC had made sufficient Qualifying Sales during her CEC employment such that CEC was required to pay Select Sound all or some portion of the earnout bonus to Select Sound for those years, around or after May 2020, May 2021, and May 2022.

41.     Schneiker has satisfied all preconditions necessary pursuant to the Retention Agreement to bringing claims relating to the Retention Agreement in this Amended Complaint.

### FIRST CLAIM FOR RELIEF:  BREACH OF COMPENSATION PLAN

42.     Schneiker restates and incorporates by reference the allegations in paragraphs 1-41 as if fully stated herein.

43.     CEC and Schneiker's Compensation Plan is an enforceable contract, as described above.

44.     Schneiker remained employed at CEC through October 4, 2021, and is therefore entitled to be paid on commissions that she earned through September 30, 2021 pursuant to the terms of the Compensation Plan.

45.     CEC has breached its Compensation Plan with Schneiker by:

8

a. Failing to pay Schneiker at least $80,000.00 in commissions on new business and managed service contracts under the Compensation Plan before the end of her employment, based on invoices that were sent to customers before the end of Schneiker's employment;

b. Failing to pay around $60,000.00 in commissions on a "hold" account, which was offered to Schneiker by Ebnet in or around February 2021, which she accepted and which Ebnet approved with regard to a $1.2 Million project on which Schneiker was entitled to a 5% commission in the Compensation Plan;

c. Failing to pay Schneiker an additional $10,000 - $25,000 in "new business" related commissions, from which Ebnet wrongfully withheld his approval without basis prior to the end of Schneiker's employment, thus preventing CEC from invoicing customers for the orders off of which Schneiker had earned the commissions; and,

d. Failing to pay an additional $40,000 in "new business" and "managed services" commissions, which were not invoiced prior to her termination by negligence or intentional delay by one or more agents of CEC.

46. By failing and refusing to pay Schneiker the amounts owed to Schneiker under the Compensation Plan, CEC owes Schneiker damages in the amount of around $200,000.00, or another amount to be shown at trial.

**SECOND CLAIM FOR RELIEF:  WAGE CLAIM UNDER CH. 109, WIS. STATS.**

47. Schneiker restates and incorporates paragraphs 1-46 of this Complaint by reference.

48. Between May 2019 and October 4, 2021, Schneiker was CEC's "employee," as that term is defined under Wisconsin Statutes section 109.01(1r).

49. Likewise, CEC was at all times herein an "employer" within the meaning of Wisconsin Statutes.

50. The commissions that CEC owes Schneiker under the Compensation Plan are "wages" recoverable by Schneiker as CEC's employee under Wisconsin Statutes section 109.01(3).

50371805

51.     By failing to pay Schneiker the wages that she was owed by virtue of her employment, CEC violated Wisconsin Statutes section 109.03 and is liable for the unpaid commissions amounts, plus all costs, including reasonable attorney fees and civil penalties pursuant to Wis. Stat. § 109.11(2)(a), and under Wis. Stat. § 109.03(5) and (6).

### THIRD CLAIM FOR RELIEF: CIVIL THEFT UNDER WIS. STAT. §§ 895.446 & 943.20(B)

52.     Schneiker restates and incorporates paragraphs 1-51 of this Complaint by reference.

53.     On February 15, 2023, Schneiker, through counsel, made a specific demand to CEC for unpaid wages and commissions owed to Schneiker and being wrongfully withheld by CEC in the amount of $49,918.85, which reflected amounts that Schneiker could by then determine that CEC knew or should have known were owed to Schneiker based on the sales and account information that CEC provided Schneiker after she filed this lawsuit.

54.     By virtue of its business, CEC wrongfully remains in possession of at least $49,918.85, which Schneiker is entitled to receive and which Schneiker demanded that CEC pay, and CEC has retained those funds without Schneiker's consent with the intent to convert and retain those amounts for its own use.

55.     By wrongfully withholding those amounts, and by refusing Schneiker's demand to pay them to her, with the intent to convert those funds to its own use and purposes, CEC is liable to Schneiker for all such wrongfully withheld and converted amounts, along with penalties, treble damages and attorney's fees pursuant to Wisconsin Statutes section 895.446(3).

56.     The amounts due and owing to Schneiker under this Claim are subject to change as discovery proceeds.

50371805

## FOURTH CLAIM FOR RELIEF: WAGE LIEN ON CEC'S PROPERTY IN WISCONSIN UNDER WIS. STAT. § 109.09(2)(b)1

57.     Schneiker restates and incorporates paragraphs 1-56 of this Complaint by reference.

58.     Pursuant to Wis. Stat. § 109.09(2)(a), "an employee who brings an action under s. 109.03 (5) shall have a lien upon all property of the employer, real or personal, located in this state for the full amount of any wage claim or wage deficiency."

59.     As a result of Schneiker's wage claim above, pursuant to Wis. Stat. § 109.03(5), Schneiker shall have a lien on CEC's property located in Wisconsin for the full amount of unpaid wages that CEC owes to her, equaling around $200,000.00.

60.     Schneiker's wage lien, which has been filed in Waukesha County, Wisconsin, became effective by November 29, 2022, a date by which all preconditions under Wis. Stat. § 109.09(2)(b) were satisfied.

## FIFTH CLAIM FOR RELIEF, IN THE ALTERNATIVE: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

61.     Schneiker restates and incorporates paragraphs 1-60 of this Complaint by reference.

62.     Under Wisconsin law, all parties to a contract have an implied duty to deal in good faith and fairly with each other.

63.     As a party to the Compensation Plan, CEC had a duty to deal in good faith with Schneiker. That duty included not unreasonably terminating Schneiker's employment before she would be entitled to receive a substantial payment of commissions pursuant to the Compensation Plan, including but not limited to the $60,000 commission for the "hold" account that Ebnet approved and the $40,000 commission payment for orders that CEC's agents neglected or

11

otherwise failed to process invoices to customers, triggering them as payable to Schneiker in CEC's system.

64.     On information and belief, Ebnet and CEC were aware of the commissions payments that would, at the time, be payable to Schneiker in short order, and terminated her employment in order to avoid making the commissions payments to her.

65.     In the event that some or all of the commissions sought above are not recoverable due to preconditions in the Compensation Plan, which as alleged herein, CEC's agents negligently or intentionally prevented Schneiker from fulfilling, CEC is liable for those amounts as damages attributable to its breach of its duty to her of good faith and fair dealing.

66.     CEC's breach of its duty to deal with Schneiker in good faith and fairly have caused Schneiker damages in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF, IN THE ALTERNATIVE:  PROMISSORY ESTOPPEL**

67.     Schneiker restates and incorporates paragraphs 1-41 of this Complaint by reference.

68.     In the alternative, if CEC is not required to pay one or more of the commissions sought pursuant to the Compensation Plan, they are required to do so under the theory of promissory estoppel.

69.     CEC promised to compensate Schneiker for her work with each of the commissions sought above — in certain instances, making such promises through its agents like Ebnet. In so promising, CEC reasonably foresaw and intended that Schneiker would rely on such promises and continue bringing in additional customers and business to CEC.

70.     In all instances, the commission amounts that Schneiker seeks from CEC were determined based mutually-agreed upon rates set forth in the Compensation Plan, even if the payment of such commissions is not necessarily covered by the Compensation Plan.

12

71.     When Schneiker demanded that CEC abide by its promises and pay her the commissions that they had promised, CEC consistently refused to do so.

72.     As a result, Schneiker has sustained damages in an amount of around $200,000.00 or another amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF, IN THE ALTERNATIVE:  QUANTUM MERUIT**

73.     Schneiker restates and incorporates paragraphs 1-41 of this Complaint by reference.

74.     In the alternative, if CEC is not required to pay one or more of the commissions sought pursuant to the Compensation Plan, they are required to do so under the theory of Quantum Meruit.

75.     CEC requested that Schneiker continue to obtain the sales that would normally entitle her to commissions payments under Compensation Plan before it unilaterally terminated her employment.

76.     Schneiker made CEC aware on numerous occasions before the end of her employment that she expected to receive compensation at the percentages agreed to in the Compensation Plan for each order that was finalized and for which she should receive a commission under the Compensation Plan.

77.     Yet, in many cases, CEC or its agents wrongfully withheld approval or failed to process the final orders within CEC's system such that, although Schneiker had done all that was required on her end to earn the requisite commissions sought above, CEC did not account for them as payable to Schneiker.

78.     Only in the event that the CEC's and Schneiker's rights and responsibilities regarding such commission payments are not determined by the Compensation Plan, CEC is

13

required to compensate Schneiker with those commissions as the reasonable compensation for the value of her work, in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH RETENTION AGREEMENT**

79.     Schneiker restates and incorporates paragraphs 1-41 of this Complaint by reference.

80.     Schneiker and Select Sound entered into the Retention Agreement, of which CEC was aware at all material times, including with respect to the amounts owed to Schneiker thereunder if CEC hit certain revenue thresholds for Qualifying Sales and if it had properly awarded Select Sound with earnout amounts pursuant to the terms of CEC's and Select Sound's transaction.

81.     While having knowledge of the Retention Agreement, CEC interfered with Schneiker's right to receive yearly retention bonuses under the Retention Agreement around or after May 2020, May 2021, May 2022 and May 2023 by intentionally and artificially depressing the Qualifying Sales that CEC counted toward the requisite revenue and sales thresholds that needed to be passed in order for CEC to owe yearly earnout amounts to Select Sound under the terms of Select Sound and CEC's transaction, in effect causing Select Sound to unknowingly breach the Retention Agreement with Schneiker because, in reality, Select Sound was entitled to receive payments each year from CEC.

82.     Schneiker did not discover CEC's interference with the Retention Agreement until after commencing this litigation and the parties began exchanging documents and information related to Schneiker's sales and commissions during her CEC employment.

83.     CEC's interference with Schneiker's right to receive payments under the Retention Agreement was done maliciously and/or in and through an intentional disregard of Schneiker's rights.

14

50371805

84.     CEC's interference with Schneiker's right to receive payments under the Retention Agreement was not privileged in any way, and CEC communicated false information to Select Sound in relation to the Qualifying Sales in order to justify, falsely, its failures to pay Select Sound each year.

85.     CEC's tortious interference with Schneiker's Retention Agreement with Select Sound, under which Schneiker would have been owed a yearly retention bonus of up to $150,000.00 each year, has caused damages to Schneiker in an amount of $600,000.00, or another amount, along with punitive damages, to be determined at trial.

## NINTH CLAIM FOR RELIEF: UNJUST ENRCIHMENT

86.     Schneiker restates and incorporates paragraphs 1-41 of this Complaint by reference.

87.     CEC knew about the Retention Agreement between Schneiker and Select Sound, including in relation to the amounts owed to Schneiker thereunder if CEC hit certain revenue thresholds for Qualifying Sales and properly awarded Select Sound with earnout amounts it was entitled to receive pursuant to the terms of CEC's and Select Sound's transaction.

88.     While having knowledge of the Retention Agreement, CEC intentionally and artificially suppressed its Qualifying Sales so that it could retain the amounts owed to Select Sound and Schneiker.

89.     Prior to and during the course of her CEC employment, Schneiker conferred substantial benefits on CEC in relation to assisting CEC with transitioning Select Sound's Rauland account and relationship to CEC, a result that was known by, sought after and desired by CEC such that CEC conditioned its purchase of Select Sound's assets upon securing Schneiker's employment with CEC to do exactly that.

15

90.     While having knowledge of the amounts Schneiker would have been entitled to receive under the Retention Agreement had CEC properly calculated its Qualifying Sales and paid Select Sound what it was entitled to receive, CEC improperly suppressed those Qualifying Sales, resulting in CEC knowingly retaining the amounts that should have been paid to Schneiker under the Retention Agreement around or after May 2020, May 2021, May 2022 and May 2023, in an amount of $600,000.00, or another amount to be determined at trial.

91.     CEC has knowingly retained those amounts that should have been paid to Schneiker under unjust circumstances that require it to disgorge the amounts that Schneiker should have received, in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests judgment by the Court as follows:

a)  Enter judgment in Schneiker's favor on all of her claims against CEC;

b)  Award Schneiker compensatory damages with interest and punitive damages;

c)  Award Schneiker 150% of her wage damages pursuant to Wis. Stat. § 109.11(2)(a);

d)  Award Schneiker her attorney's fees and statutory penalties, pursuant to Wis. Stat. §§ 109.03(6) and 895.446;

e)  Award Schneiker all costs of investigating CEC's actions, including her attorney's fees, and,

f)  Grant Schneiker such additional relief as may be appropriate.


**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Dated this 1st day of September, 2023.

16

Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, Wisconsin 53202
Telephone:  414-298-s1000
Facsimile:  414-298-8097

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965

42629856

*s/ Michael J. Gentry*
Michael J. Gentry
WI State Bar ID No. 1091204
mgentry@reinhartlaw.com

*Attorneys for Plaintiff Amanda Schneiker*

50371805